Argued 26 July: decided 15 August, 1900.

## SHANNON *v.* PORTLAND.

[62 Pac. 50.]

SUIT TO REMOVE CLOUD — SUFFICIENCY OF COMPLAINT.

1. A complaint in a suit to remove a cloud from a title must show the particular muniment which is said to constitute the cloud, and the particular infirmity which renders it void; and the facts as to the infirmity must be set out, it will not be. sufficient to allege generally that the muniment or record is void: *O'Hara* v. *Parker,* 27 Or. 156, approved. Thus, an allegation that a certain section of a city charter "in so far as

it attempts to authorize any improvement or repair of any street to be made without any petition therefor, or without any remonstrance being heard thereto, and also by reason of not providing for any sufficient notice thereof, is unconstitutional and void," is not the equivalent of an allegation that no notice was given of the proposed improvement, or that no opportunity was afforded plaintiff of being heard upon the question of the proportion of costs to be assessed against each parcel of land affected.

CONSTITUTIONALITY OF CHARTER — NOTICE OF PUBLIC IMPROVEMENT.

2.   It is not necessary to the validity of a section of a city charter conferring the right to improve a street that it should provide for notice of the time and place of apportioning the cost of the improvement, or that it shall be so provided in the charter at all; it is sufficient if reasonable notice is in fact given: *Wilson* v. *City of Salem*, 24 Or. 504, cited.

QUESTIONS WITHIN THE SCOPE OF THE PLEADINGS.

3.   Matters that are not by reasonable intendment and construction within the scope of the pleadings, cannot be considered on appeal; the allegations of the complaint in this case do not raise the question of lack of notice of the proposed street improvement, or the question whether the expense was apportioned according to the benefit received: *Cook* v. *City of Portland*, 35 Or. 383, and *Allen* v. *City of Portland*, 35 Or. 420, cited and applied.

UNSAFE STREET — DETERMINATION OF COUNCIL.

4.   A common council was justified in deciding a street to be unsafe for travel where it appeared that the street was an elevated roadway over low lands; that such roadway had been seriously injured by an overflow of an adjoining river; that the piling supporting it was badly decayed, and that the entire structure was described by different witnesses as "beyond repair" and "very rotten"; and that the timbers had been exposed for a period about equal to the life of timbers in such structures.

STREET IMPROVEMENT — FRAUD OF COUNCIL.

5.   An assessment for a street improvement will not be set aside for fraud of the council in letting the contract therefor, although it appears that the accepted bid was nearly 50 per cent. above a fair cash price for the work where the contractors were paid in depreciated city warrants, since the bid was not so high that its acceptance could not be accounted for on the ground of improvidence of the council.

From Multnomah: ÁLFRED F. SEARS, JR., Judge.

This is a suit by E. Shannon and others to enjoin the collection of certain street assessments made to defray the cost

of improving and repairing East Water Street, between East Oak Street and Hawthorne Avenue, in the City of Portland. The complaint alleges, in substance, that plaintiffs are the owners and in possession of certain lots and blocks abutting upon the improvement; that on August 7, 1895, upon petition of Dana, Albee & Walker, the Wolff & Zwicker Iron Works, and the Standard Oil Company, the common council of the City of Portland adopted a resolution declaring said portion of East Water Street to be unsafe and dangerous to persons and teams, and directing the auditor to give notice, in the manner and for the time required by the city charter, that it was proposed to improve it at the expense of the property liable therefor, as provided in sections 114 and 115 of the city charter, by constructing on piles an elevated plank roadway, 36 feet in width, together with 12-foot sidewalks upon the established grade, in accordance with the plans and specifications therefor; that in pursuance of said resolution the auditor gave the required notice by publication for ten days from and after the fourteenth day of August, 1895; that on October 2, 1895, the common council passed Ordinance No. 9480, entitled "An ordinance providing for the time and manner of improving East Water Street," etc., and provided for the improvement of said street in the manner set forth in the aforesaid resolution, and authorized the committee on streets to advertise, receive proposals, and enter into a contract for, such improvement, in accordance with the provisions of Ordinances Nos. 9183, 9248, and 9283 of said city, and that the same should be made a part of such contract; that thereafter the city advertised for bids, and entered into a contract for the improvement with O'Neil & Lind; that the bidding was collusive; that only two bids were submitted, and the bidders had knowledge of the amount of both; that the bid of F. H. Young was about ten per cent. higher on each lot than that of O'Neil & Lind, and was made solely to secure the con-

tract for the latter firm; that their bid of $11,824.31 was unreasonable, and not less than 33 1-3 per cent. in excess of the reasonable cost and value of the work done; that the reasonable cost of the work advertised for does not and should not exceed the sum of $8,500, and that it was the duty of said common council to reject said bid; that said facts were brought to the notice of the council and street committee, and that their acts in entering into said contract operated as a fraud on the plaintiffs.

It is then further alleged that said contract, specifications, and Ordinances Nos. 9183, 9248, and 9283 required all the lumber used therein to be of the best quality of yellow fir, etc., but that at least 75 per cent. of it is young growth red fir, wany, and full of sap; that all the caps are of red fir, and are not as good as those thrown away; that the life of yellow fir in such improvements is from 25 to 50 per cent. longer than that of red fir; that said improvement is higher than the established grade, and the piles used therein are not driven to the depth required; that notices of the completion of the improvement, stating the time within which objections to the acceptance might be made, were published by the city auditor in the newspaper doing the city printing, under dates of December 27, 1895, February 12, 1896, and February 27, 1896; that within the time for making objections, and during the progress of the work, plaintiffs made and filed written protests, objections, and remonstrances, stating their reasons against the acceptance thereof; that the common council and committee on streets at all times knew that said work was not being done according to contract; that on January 3, 1896, the council passed Ordinance No. 9597, entitled "An ordinance declaring the probable cost of improving East Water Street," etc.; that by said ordinance they directed the city auditor to enter a statement of the assessment thereby made in the docket of city liens, and to

cause notice thereof to be published, as provided by the charter; that thereafter a statement of the assessments made by said Ordinance No. 9597 was entered in the docket of city liens; that said auditor gave ten days' notice by publication in the Evening Telegram, a daily newspaper published in the City of Portland, dated January 7, 1896, that said assessments were due and payable at the office of the city treasurer, and that, unless paid within fifteen days from the date thereof, they would be delinquent and bear interest, and warrants would be ordered for the collection thereof; that none of said assessments have been paid; that on February 5, 1896, said council passed Ordinance No. 9636, authorizing the city auditor to issue warrants to the chief of police for the collection of the said assessments; that thereafter the auditor issued warrants as so directed for the collection of said assessments against plaintiffs.

It is further alleged that the work done and the materials furnished constituted an improvement or repair of the said street, and that no part thereof was necessary to render it safe and not dangerous; that in making said improvement or repair the said common council attempted to proceed under section 122 of "An act to incorporate the City of Portland, and to provide a charter therefor, and to repeal an act entitled 'An act to incorporate the City of Portland,' filed in the office of the Secretary of State, February 19, 1891," filed in the office of the Secretary of State February 23, 1893 (Laws 1893, p. 810); that said section 122, in so far as it attempts to authorize any improvement or repair of any street to be made without any petition therefor, or opportunity for remonstrance, and also by reason of not providing for any sufficient notice thereof, is unconstitutional and void; that, as a matter of fact, said portion of East Water Street was not, nor was any part thereof, unsafe or dangerous to persons or teams passing on, along, or over the same, within the true intent or meaning of those words, as

used in said section 122; that said improvement or repair was made without any petition of any one or more of the owners of property affected thereby, except the aforesaid petition of August 7, 1895, and that, of said petitioners, Dana, Albee & Walker, are not abutting owners; that the Wolff & Zwicker Iron Works owned lots 5, 6, 7, and 8, in block 11, and the Standard Oil Company owned lots 1, 2, 3, and 4, in block 13; and that all of said petitioners were not the owners of one-third of the property affected by said improvement, and said petition did not specify the kind of improvement asked. It is then alleged that by reason of certain improvements made upon said street and parts thereof in the years 1871, 1883, 1884, 1885, 1886, and 1887, and of certain provisions contained in the charter of the City of East Portland, then in force, it was not subject to any further improvements at the expense of the abutting property, and, further, that by reason of a certain franchise granted by said City of East Portland April 24, 1888, under Ordinance No. 646 and its amendments, to Frank Dekum, R. L. Durham, and their associates and assigns, to construct and operate a railway upon and along said street, whereby they undertook to keep the same in repair at their own expense, the city is now estopped from assessing these plaintiffs with the cost of the improvement in question. The prayer is that said assessments be declared to be without authority of law and void, that they do not constitute a lien upon plaintiffs' property, that they be canceled, and meanwhile that defendants be enjoined from enforcing collection. The answer puts in issue all matters of fact, except the record of the proceedings of the common council, and the allegation that the improvement was made under section 122 of the charter of 1893. Some further matter is set up by way of defense, a statement of which is not essential to an understanding of the issues now involved. A decree having been

rendered, after trial, in favor of defendants, certain of the plaintiffs appeal.                                    AFFIRMED.

For appellants there was a brief over the name of *Reed & Hogue,* with an oral argument by *Mr. Harry W. Hogue.*

For respondent there was a brief over the names of *Joel M. Long,* City Attorney, and *Ralph R. Duniway,* with an oral argument by *Mr. Long.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

Two questions are urged here, which, it is argued, are indisputably fatal to the validity of the alleged assessments. These are (1) that no sufficient notice was ever given to the plaintiffs, nor were they afforded an opportunity of being heard upon the question of the proportion of the cost to be assessed against each lot or parcel of land involved in the suit, and therefore they were denied their day in court; and (2) the assessments against the abutting lots were not made upon the principle or basis of peculiar benefits accruing by reason of the improvement; and for both of these reasons it is claimed that plaintiffs are about to be deprived or devested of their property without due process of law, contrary to the inhibition of the federal constitution. But plaintiffs are met at the threshold with the objection that these questions are not presented by the record, and therefore are not in issue. A question of like nature was presented in the case of *Allen* v. *City of Portland,* 35 Or. 420 (58 Pac. 509), and the decision therein is in support of the objection. A decided effort is now made to show that the doctrine of that case is fallacious and unsound, but that, should it be adhered to, then the case at bar is susceptible of distinguishment, in that the questions designed to be presented here are in the record in proper manner for adjudication, and

ought to be considered. A criticism is suggestetd that the
*Allen Case* seems to have gone off upon the proposition that
there was no question involved through which the federal su-
preme court would take jurisdiction to determine the con-
troversy by writ of error, and it is insisted that it comprised
as well the proposition whether the scope of the pleadings
was sufficiently comprehensive to admit of inquiry touching
the federal question. The *Allen Case* was presented upon
the express proposition that there was a question in the case
such as would give the federal supreme court jurisdiction by
writ of error from this court, which accounts for the man-
ner in which it was treated and disposed of. While the other
phase of the question was in the record, it was not specifically
discussed, except by such allusions as were made to it in
the petition for rehearing. The whole question was involved
there as here, and, while the reasons given for not consider-
ing it may not have covered the whole ground, they were,
as we are yet impressed, amply sufficient to support the con-
clusion reached; hence we shall not now attempt to review
that case, as respects the reasons there assigned. The sug-
gestion is made that the question touching the want of
proper notice, and an opportunity to be heard as to the pro-
portion of the cost to be assessed against each lot, if prop-
erly in the record, leads irresistibly to the consideration of
the second,—that the assessment was not made upon the
basis of benefits received by reason of the improvement,—be-
cause, if notice were given, it would be unavailing, the
council having no power under the charter to give relief.
They could make but one kind of apportionment, namely,
the one prescribed by sections 114 and 115. In other words,
it is urged that the legislature has fixed the apportionment
in advance, not upon the basis of peculiar benefits, but ar-
bitrarily and absolutely,—that certain lots or property shall
bear certain burdens,—and left the council without discre-
tion in the premises. The two questions, for the reasons as-

signed, are naturally cognate, or one of a piece; and, therefore, if one is to be considered, the other ought to be, also.

Pleadings are liberally construed when the questions are upon the admissibility of evidence, or at or subsequent to trial, to the end and purpose that matters may be settled finally while in court. Let us inquire, then, whether, under the rule, the federal questions suggested are involved here, without reference to the specific inquiry whether or not the federal supreme court will take cognizance of the cause. In the reply brief is given a perspicuous and fair analysis of the facts alleged in the complaint. They include, as counsel say, "the location and ownership of plaintiffs' property on East Water Street; resolution declaring the street dangerous, and authorizing notice of intention to improve; publication of notice; passage of ordinance providing for time and manner of improvement; taking of bids and making of contract; notices of completion, and objections to acceptance; passage of ordinance declaring probable cost, and directing entry in lien docket; notice that assessments were due and payable, and would be delinquent; nonpayment of assessments; passage of ordinance authorizing an issue of warrants for collection of assessments; notices given by chief of police of sale under warrants; threats and intention of chief of police to sell; injury which would result from sale; bringing of suit on behalf of plaintiffs and all other owners affected; absence of a plain, speedy, and adequate remedy at law." In addition to these, it is further alleged, as stated, "that in making said improvement or repair the said common council attempted to proceed under section 122 of the charter of the said City of Portland, the same being an act of the Legislative Assembly of the State of Oregon entitled "An act to incorporate the City of Portland, and to provide a charter therefor, and to repeal an act entitled "An act to incorporate the City of Portland," filed in the office of the Secretary of State, February 19, 1891," filed in the

office of the Secretary of State February 23, 1893; that said section 122 of said charter, in so far as it attempts to authorize any improvement or repair of any street to be made without any petition therefor, or without any remonstrance being heard thereto, and also by reason of not providing for any sufficient notice thereof, is unconstitutional and void; * * * that said pretended assessments against said property of plaintiffs, although apparently regular, and all pro-·ceedings in relation thereto, are null and void, by reason of the facts hereinbefore alleged, and said City of Portland and said common council thereof were without jurisdiction to make said assessment or do any of the aforesaid acts or proceedings, and that there is no valid assessment against any of said property of plaintiffs; and that said warrants have been issued without authority of law." The last allegation, "that said pretended assessments against said property of plaintiffs, although apparently regular," etc., is simply a conclusion which the pleader asserts, and nothing further need be said of it.

1. This suit involves a direct attack upon the assessments, and, being so, it is incumbent upon the plaintiffs to show wherein the proceedings by which they were laid are a nullity. Some facts must be alleged by which the court can say, from an inspection of the complaint, by fair and liberal interpretation, that the record of the city is insufficient to support the assessments. The entire purpose of the suit is to remove an apparent cloud from the title of plaintiffs, and the assessments and the lien imposed thereby, by which the city is afforded a means of subjecting the property to sale to enforce payment, constitute the cloud. It is essential to the maintenance of such a suit to assert and establish (1) the particular muniment or record constituting the cloud; and (2) the infirmity attending it, which renders it a nullity as to the complainant, for, if he does not show it to be a nullity, he must fail of his purpose: *O'Hara* v. *Parker, 27*

Or. 156 (39 Pac. 1004). To establish the infirmity, facts, not conclusions, must be alleged. It is a common occurrence that a muniment is void because of several facts. Take an ordinary title deed, for instance. It may be void as a conveyance because it does not contain the private seal of the grantor, or through want of a proper revenue stamp, or by reason of the grantor's name having been forged thereto, or because he was forced to sign it through duress, or it was obtained by means of some designated fraud, or, as against an innocent purchaser, that it was not recorded. Now, only such of these facts as are set up can be proven; and, if a party neglects to state all those tending to invalidate the instrument, he cannot be permitted to prove such as he has omitted. They do not constitute or become issues in the case, and hence are foreign to the inquiry. It is unnecessary to cite authorities upon this proposition. It will be conceded. Let us now examine the complaint, and determine whether facts are alleged pertinent upon which to base issues, as respects the two questions here sought to be presented. Giving the allegation (namely, "that said section 122 of said charter," etc.), the most liberal construction, it is not the equivalent of an allegation that notice was not given, or that no opportunity was afforded the plaintiffs of being heard upon the question of the proportion of costs to be assessed against each lot or parcel.

2. Since the case of *Smith* v. *Minto,* 30 Or. 351 (48 Pac. 166), we are not advised that the power of the common council to make improvements, under the latter clause of said section 122, has ever been questioned, where the insecurity or danger to persons or teams from the condition of the street is such as to require attention on the part of the council, to prevent injury or casualty. It should be noted, also, that the clause has been amended since the decision of that case so as to require the council to give ten days' notice, by publication in some newspaper of the city, of the intended

improvement.    Such notice was given in the present in-
stance, but it is not requisite to the validity of the said sec-
tion that it should provide for notice of the time and place
of apportionment of the cost, nor is it even necessary that the
charter should so provide.    Such notice may be provided for
by ordinance, and, when so provided for and given as to
afford a reasonable opportunity for a hearing, it is amply
sufficient; and such is the holding of this court in *Wilson* v.
*City of Salem*, 24 Or. 504 (34 Pac. 9, 691).    See, also,
*Paulson* v. *City of Portland,* 16 Or. 450, 457 (19 Pac. 450) ;
*Paulson* v. *Portland,* 149 U. S. 30 (13 Sup. Ct. 750).    So
the allegation that said section is unconstitutional and void
because it does not provide for notice is without force or
merit, as it may nevertheless be perfectly valid and operative.
The preceding allegation is but an inducement to the one
presently considered.

3.    What other facts are alleged which go to the matter
of notice?    We are unable to find any such, and the same
observation may be made as to the matter of assessments
upon the basis of benefits.    They are not to be found in the
allegation of the location and ownership of property, nor
in that showing the adoption of the resolution declaring the
street dangerous and authorizing notice of intention to im-
prove, and so on, through the whole category of facts stated
in the complaint.    In the allegation touching the adoption of
the resolution requiring notice, it appears that the auditor
was required to give notice that the council proposed to im-
prove the street at the expense of the property holders liable
therefor, as provided in sections 114 and 115 of the city
charter; but this is the only reference made in the remotest
degree to the manner of the assessment actually made by the
council.    This is far from being the equivalent of an alle-
gation that the assessments were made without reference to
the benefits; but it is said we must assume that the council
made the assessments under the charter, as it provides for

the only method by which it can be done, and the one pre-
scribed is void, as inimical to the national constitution. If
so, upon allegations of the nature under consideration, then
must the courts look into and determine the constitutionality
of every city charter of the state, upon the mere suggestion
that an assessment has been made in pursuance of charter
provisions. This we cannot do, however. There must be
facts alleged, relevant and pertinent, upon which to base
the issue; otherwise, it cannot be considered. That the ques-
tions sought to be presented are not within the issues is ap-
parent from the findings of the court below. They cover
every question of fact and conclusion of law presented by
the pleadings, with possibly some exceptions of minor im-
portance, and a careful reading of them will suffice to show
that there is none upon the question of notice, except the one
which determines, in effect, that section 122 of the charter
is not unconstitutional and void because it does not provide
for remonstrance or notice; nor is there any upon the ques-
tion of apportionment of the costs according to benefits.
These matters are not, by reasonable intendment and liberal
construction, within the scope of the pleadings. Hence it is
not proper for us to consider them. See, also, *Cook* v. *City
of Portland,* 35 Or. 383 (58 Pac. 353), and *Dewey* v. *City
of Des Moines,* 173 U. S. 193 (19 Sup. Ct. 379).

There was a question of estoppel presented to the court
below, upon the ground that plaintiffs had previously made
a full improvement upon the same street, and therefore that
they could not be required to make this. But it is now aban-
doned, upon the authority of *Ladd* v. *City of Portland,* 32
Or. 271 (67 Am. St. Rep. 526, 51 Pac. 654). Nor is it in-
sisted here that the franchise granted to Frank Dekum and
others to construct and operate a railway upon said street,
upon the condition that they keep the same in repair, operates
to prevent the city from making the improvement at the
expense of the abutting property.

4.   The other questions presented are of fact, the first of which is whether the city acquired jurisdiction to make the improvement by reason of the dangerous, insecure, and unsafe condition of the street or roadway, within the purview and intendment of the latter paragraph or clause of section 122.   It was said in *Smith* v. *Minto,* 30 Or. 351 (48 Pac. 166) : "The power of the council to proceed in the matter depended upon the fact of the street being unsafe and dangerous to persons and teams, within the meaning of the latter clause of section 120 (now 122), at the time the improvement was ordered," which is a jurisdictional matter, and the findings of the city council are not conclusive thereon. In consequence of the large amount of testimony taken and submitted, it is not practicable to do more than state our conclusions, without attempting to enter into details or to discuss largely its weight and sufficiency.   The portion of East Water Street covered by the improvement in question was first improved in 1871, by the construction of an elevated roadway 36 feet in width, upon a grade somewhat below the present one.   This consisted of bents resting upon mudsills, stringers, and three-inch planking, and is denominated in the complaint a "full improvement."   In 1883 another full improvement was made upon said street, running as far north as East Washington Street, which includes all but two blocks of the space occupied by the present one. This structure rested upon piles set six feet in the ground, braced by sway braces, surmounted by 10x12-inch caps, resting upon which were seven rows of 4x14-inch to 4x16-inch stringers; and these supported the decking, consisting of 4x12-inch lumber.   The bents were 20 feet apart, with five piles to the bent.   The roadway from East Washington Street north was rebuilt in the years 1886 and 1887, and differed from that portion above described, in that the bents rested upon mudsills.   Some time previous to 1891 the decking between Hawthorne Avenue and East Washington

Street became badly worn, and the city redecked 18 feet of it in the center, by putting down the new decking over the old. The high water of 1894 impaired the structure by raising the decking and stringers out of place. In some instances the piles were raised out of the ground, and in others the caps were lifted; the drift bolts driven through them into the piles being drawn out. The structure did not settle back to its place, which left it out of level. Repairs were subsequently made, and the surface, although not upon the grade, was put in condition suitable for use. On August 7, 1895, more than a year later, H. D. Gradon, the superintendent of streets, made report to the common council that said street was in an exceedingly dangerous condition; that repairs of a temporary nature could be made at a cost of $1,600, but that, in his opinion, it would be more economical to rebuild the entire structure; that it was costing the city $50 per month to repair the breaks in the roadway; and that serious damage to life and property might happen at any time. On the same day the council initiated the proceedings for the improvement.

Before the work was ordered, however, a careful examination was made of the old structure by a committee of several gentlemen appointed for the express purpose. From among them, W. B. Chase, a civil engineer of considerable experience, was called as a witness in behalf of the city. He appears to be intelligent and conservative, and we quote from his testimony, as containing a fair estimate of the condition of the old structure at the time the new improvement was directed to be made. When asked to describe the condition in which he found the bridge, he says: "I found some one had been under the bridge prior to my visit and had chopped into nearly every pile, so that I had a good opportunity of seeing the condition of them. Some one, also, prior to this time, had repaired or replaced some of

these round posts with square timbers. I think in the first 960 feet there were more than forty posts in of square timber. The balance of that distance had quite a number of such ones, but I did not count them. I counted that many first. Some of the piles were very much decayed, indeed. One instance, I remember. Some one had thrust a crowbar entirely through one. The marks of the ax indicated the rot was from three to four inches deep, down near the ground. At the top the piles were all decayed more or less where the caps rested on them. I found where sway braces had gone that there was more or less decay, and the bridge looked old and decayed and out of order,—all the substructure. * * * I considered that it was time to condemn the bridge. I have had a good deal to do with bridges, and I considered it time to condemn that bridge. That was the result of it. * * * We say that whenever a bridge is in such condition that it has not sufficient strength in all of its parts to meet the emergencies that are liable to arise, or may arise at any time, that that structure is unsafe; and then we say that when the cost of repairing a structure, or maintaining it, exceeds the interest of the cost of the new structure, it is time to rebuild it entirely. * * * I considered it unsafe. * * * I would apply it to both (the substructure and superstructure). The deck was especially bad,—the superstructure. The substructure, if you please, the posts, were so many of them bad that I would not con· sider it advisable or desirable to place a new deck on it. Some of the posts were badly decayed,—to such an extent that, as an engineer, I could not take them or accept them as suitable posts for the structure." When asked, "Was the decking in such condition as to meet the emergencies that were likely to arise?" he continues: "No, sir; I do not think so. Of course, it is possible that a man, by careful driving, could drive a heavy load over there; but that is never proof that

a bridge, when decayed, is safe. It is evidence, however, but I would not have ordered a large load taken down over that bridge in the condition it was when I saw it. I consider it would have been extremely dangerous for the fire department, with its usual haste, to pass over that roadway. I considered it a dangerous deck. * * * A structure twelve years old is generally worn out; not every stick is entirely rotted, but the joists, and wherever timber touches, are usually decayed, and the structure is so far gone that the percentage of repair is too great to warrant the reconstruction. After twelve years these old bridges are subjects of a great amount of care on the part of the street department. We begin to know them as being unsafe and as needing constant attention. * * * There was a good deal of the timber had sound places in it, where it was free to the air, like the middle of a stringer; but nearly all of the timber had decayed portions, so that I regarded it as unfit to be placed in a new structure. It seemed to me that while there might have been here and there a few stringers that were sound for the time, the substructure was so bad that it would not warrant their use, and after a good deal of consideration I concluded that the bridge ought to have been condemned and rebuilt as it was."

There is a good deal of evidence going much further than this. Mr. Hall, a councilman, who was on the street committee, and made a special examination of the old structure, says: "It was in a very dangerous condition," and "not a great deal of what you would call sound timber in it." George C. Flanders says, "The bridge was in a very rotten condition." O'Neil testifies that "the stringers were all rotten where they rested on the caps"; and Hurlburt, that he "considered the roadway practically beyond repair." There is much testimony going to the establishment of a contrary view, but, upon the whole, we are of the opinion that the common council was warranted in making the improve-

ment.   It is very significant that the structure of 1871 lasted but twelve years, while it was subjected to repairs in the meanwhile.   The structure of 1883 was about the same age when it was condemned and replaced by the present one. True, it was built upon piles, while the other rested upon mudsills, and may have been more durable; but the high water of 1894 impaired it very materially, and tended generally to its deterioration.   Mr. Chase testifies that the lifetime of timber such as was contained in the bridge is from nine to eleven or twelve years.   So, when considered in the light of the probable longevity of such a structure, we find that the old one had outlived its usefulness, and was about approaching the time when it would be expected to succumb to the elements.   Hence we conclude that the weight of the testimony is in harmony with the idea that it was dangerous and unsafe for men and teams to pass along and over the same at the time the new structure was directed to be built.

5.   It is claimed that the bids for the improvement were collusive, and that the one accepted by the council was unreasonable, being at least 33 1-3 per cent. in excess of the reasonable cost and value thereof; that the reasonable cost of the work advertised for did not exceed the sum of $8,500, whereas the bid accepted was $11,824.31; and that it was the duty of the council to have declared the same unreasonable and rejected it, they having had full knowledge of the character of the bid in this respect.   Fraud is therefore attributed to the common council in letting the contract.   It is not claimed that the council intentionally or actively participated in the alleged fraud, but that what they did, under the circumstances and conditions attending the letting of the contract, was constructively fraudulent, in so far as it affects the abutting property holders.   It is first argued that the bids of F. H. Young and O'Neil & Lind, being the only ones submitted, were collusive, because, as Lind testifies, Young made the estimate of the cost of the work upon which O'Neil

& Lind based their bid, and that it appeared upon the face of the bids that Young's bid was about ten per cent. higher on each item than that of O'Neil & Lind. But the council knew nothing at the time as to who made the estimate, nor did they have any intimation that O'Neil & Lind based their bid upon the estimate made by Young, neither is it so contended. The bids, however, showed for themselves, but the fact that one was ten per cent. higher than the other generally was a mere coincidence, which would not ordinarily attract notice.

The most suggestive indication of fraud is that the bid accepted was excessively high. Section 118 of the charter requires that the work must be let to the lowest responsible bidder, but that the council may provide for the rejection of any and all bids when deemed unreasonable. Under this section, the council were to be the judges whether the bid was unreasonable, and, without direct evidence showing a fraudulent purpose, the bid must have been grossly in excess of the fair value of the construction of the improvement to warrant a charge of fraud. Some estimates of the cost of the improvement, including what was considered a reasonable profit, ranging from $8,400 to $8,800, were submitted in evidence; but much more testimony was offered by way of comparison with the cost of the improvement made in 1883, which, it must be admitted, was very unsatisfactory and unreliable as a basis for the ascertainment of the actual value of constructing the present one. A feature of some importance to be considered is that the warrants such as the city issued in payment for work of the kind were selling in the market at a large discount, which was taken into consideration by the contractors in arriving at the amount of their bid. Lind says that 75 to 80 cents was all they could get for the warrants. This fact may have had much influence upon the council, as it could not be expected that the work could be done at its cash value when payment was to be made

in depreciated warrants. Without pursuing the subject further, suffice it to say that the bid does not appear to be so greatly excessive as that it was fraudulent *per se* for the council to accept it and let the contract accordingly. It would have been a palpable fraud, imputable to the common council in letting the contract, if it could be said under the evidence that the bid or price paid for the work was largely in excess of the reasonable and fair value thereof, and of any sum which common prudence and honesty would dictate that it ought to cost; but where the difference in price and cost or value of the work is such only as can be fully accounted for upon the theory that it has been merely improvidently, or perhaps extravagantly, done, a case is not made for the interference of the court. *In re Livingston,* 121 N. Y. 94 (24 N. E. 290) ; *In re Leake & Watts Orphan Home,* 92 N. Y. 116. While it would seem that the council cannot be held to be altogether blameless, there is not sufficient in the case to impute positive fraud to them, such as will void the assessment.

And lastly it is urged that the work done was not in accordance with the contract, and that the assessment should be annulled for that reason. But we are satisfied from a careful survey of the evidence that there exists no sufficient cause to disturb the proceedings after the approval and acceptance of the improvement by the lawfully constituted authorities: *Chance* v. *City of Portland,* 26 Or. 286 (38 Pac. 68). The decree of the court below will therefore be affirmed, and it is so ordered.          AFFIRMED.